**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marvin D. LEHMAN,
Defendant–Appellant.**

No. 89–2246.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1989.

Decided Oct. 27, 1989.

Richard D. Humphrey, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellee.

Ralph A. Kalal, Kalal & Habermehl, Madison, Wis., for defendant-appellant.

Before CUMMINGS, WOOD, Jr., and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

The United States asks this Court to sustain a finding of civil contempt and a continuing sanctions order arising out of an investigation of defendant Marvin D. Lehman by the Packers and Stockyards Administration (the Administration) under the Packers and Stockyards Act of 1921 (the Act), 42 Stat. 159, as amended, 7 U.S.C. §§ 181–229.[1] Defendant maintains that the Administration may not compel production of records it has subpoenaed from him because, he claims, there is no longer a "required records exception" to the Fifth Amendment privilege against self-incrimination. Lehman also submits that the district court exceeded its authority by issuing an overly inclusive order that extended beyond the scope of the subpoena. Because the required records exception endorsed in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), is controlling, we affirm the district court's original

---

**1.** The Packers and Stockyards Administration of the Department of Agriculture, under the authority of the Secretary of Agriculture, is the regulatory agency charged with administration of the Act and the regulations thereunder.

sanctions order requiring Lehman to produce all records pertaining to cattle dealing. Insofar as the district court subsequently compelled Lehman to produce records that do not pertain to the Act, however, the order is too expansive and must be remanded for the entry of a narrower order.

## I. Background

Lehman operates a dairy farm in Tomah, Wisconsin. In January 1985, he registered under the Act as a non-bonded cattle dealer, licensed to purchase livestock for slaughter by a particular, bonded meat packing company. That position is known in the industry as a packer buyer. Packer buyers are clearly livestock dealers subject to regulation of the Act. 7 U.S.C. § 201(d); *Amshoff v. United States*, 228 F.2d 261 (7th Cir.1955), certiorari denied, 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466 (1956).

The government investigation, which the record suggests has been extensive, began in April 1988. It focuses on allegations that Lehman and John E. Connery, another non-bonded packer buyer who worked for a different meat packing company, were engaged in a scheme to manipulate livestock prices with the help of a bonded livestock dealer, Kenneth A. Frei, Jr. The government alleges that on numerous occasions Lehman and Connery created a profit not dictated by normal market forces by buying cattle for the account of Frei, then repurchasing the same livestock at higher prices from Frei's account for the accounts of their own employing packers. If true, such actions would violate at least two provisions of the Act: the surety bond requirements for livestock dealers, 7 U.S.C.

§ 204, and the prohibition against unfair or deceptive practices, 7 U.S.C. § 213(a).

The record reflects a persistent attempt by the Administration to obtain certain documents from Lehman. With equal persistence Lehman has sworn that he has no such documents. Every livestock dealer must "keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business." 7 U.S.C. § 221. It was therefore Lehman's duty to keep records that would adequately reveal the disposition of any livestock he bought or sold.

On June 17, 1988, agents of the Administration issued three similar administrative subpoenas *duces tecum*, one each to Lehman, Connery, and Frei. The subpoena addressed to Lehman and served personally on him demanded all records "pertaining to [Lehman's] livestock buying and selling operations" for the seventeen months between January 1, 1987, and June 17, 1988, listing various types of documents in which such information might be found.[2] The subpoena stated that the records sought were essential to an investigation to determine whether Lehman and others with whom he did business were conforming with the Act.

In a letter dated June 30, 1988, counsel for Lehman wrote to the Regional Supervisor of the Packers and Stockyards Administration that Lehman "has no records that were requested relating to livestock buying and selling." Lehman asserted that the only available records would be in the hands of his employer, a meat packing company.

**2.** The Department requested:
All books, records, memoranda, and other documentary evidence pertaining to the livestock buying and selling operations of Marvin D. Lehman for the period from January 1, 1987 to the present date, including, but not limited to: general ledger, bank statements of checking accounts and savings accounts, withdrawal slips, purchaser copies of cashier's checks and money orders, deposit tickets, check register(s), paid checks and drafts, debit and credit memos from bank statements, purchase and sale invoices, scale tickets, purchase and sale journals, health certificates,

trucking invoices, cash receipts and disbursements journal, accounts receivable records, accounts payable records, inventory records, receiving tickets, 1987 Federal and State income tax returns and records/memos detailing profit, loss or profit sharing with other individuals.

In its pleadings in this case, the government asserts that the income tax returns were requested to verify the completeness of Lehman's response and to identify any further possible violations of the Act. In this appeal Lehman has not challenged the demand for tax records.

On September 1, 1988, the government set in motion the case now before this Court by filing an enforcement action against Lehman, Connery, and Frei in the District Court for the Western District of Wisconsin, asserting that none of the defendants had responded with the requested documents and demanding responses. In an order dated November 29, 1988, the district court found that the subpoenas met statutory and constitutional requirements and were not unreasonably burdensome. The court ordered each defendant to produce "all documents, books and records specified in the subpoena directed to such defendant" by December 9, 1988. In response to a motion for reconsideration by the three defendants, the court modified its order on December 29, 1988 to allow defendants' counsel to submit only those portions of the defendants' 1987 federal and Wisconsin state tax returns relating to livestock buying and selling operations of the defendants.

In a letter to the Assistant United States Attorney handling the case, dated December 8, 1988, counsel for the defendants repeated the claim that, aside from tax records that were forwarded to the district court, Lehman and Connery "have no other books, records, memoranda or other documentary evidence" of the type described in the subpoenas.[3] Counsel again stated that the only relevant records in existence regarding the selling and buying practices of Lehman and Connery were in the hands of the meat packing companies that employed them. Counsel further stated that he had specifically directed his clients not to turn over any banking or other records that were "personal" because they were not required by the subpoenas.

On April 20, 1989, in response to a motion by the government for civil contempt for noncompliance, the court held an evidentiary hearing. Lehman testified at that hearing that he had purchased cattle on Frei's behalf several times during the period covered by the subpoena, but that he retained no records of those transactions.

Counsel for the government argued that evidence in the record—including two payments from a Frei checking account to one of Lehman's accounts, which the government maintained were inadequately explained by Lehman—suggested that Lehman was concealing within his personal banking records information relevant to the government investigation. The government asked the court to require Lehman to turn over all of his bank records "from all of his accounts" for the period covered in the subpoena. At the conclusion of the hearing, the court ruled from the bench that Lehman was in civil contempt of the court's November 29, 1988, order to produce.

In a contempt order dated April 24, 1989, the court found that Lehman was engaged in the purchase and sale of livestock "in excess of $50,000" in 1987 and that "there is every reason to believe" that Lehman's personal bank records would yield information the Administration sought in its administrative action. The court ordered Lehman to purge himself of contempt by producing, within two days, the following:

> all bank statements of checking accounts, savings accounts, withdrawal slips, purchaser copies of cashier's checks and money orders, deposit tickets, check register(s), paid checks and drafts, debit and credit memos from bank statements from any and all banks in which he had either a sole account or an account with someone else for the period January 1, 1987, through date of service of the subpoena.

The court confirmed the breadth of the order during the evidentiary hearing in this exchange:

> Counsel for Lehman: And that includes [his] and his wife's personal checking accounts and so forth[?]
>
> Court: That is correct.
>
> Counsel: How about his children's accounts?

---

3. Defense counsel asserted that Frei was in substantial compliance. The district court dismissed the government's motion for contempt

of court against Frei on April 20, 1989, finding that there remained no further relevant records for him to produce.

Court: I have some difficulty with that, but I believe that in light of the testimony he's provided, that it is essential that we have a full disclosure from Mr. Lehman. I don't want him to find those loopholes that he will continue to examine the record to find. I want it all disclosed as it relates to Mr. Lehman.[4]

The court imposed no sanction at that time.

Through counsel, Lehman responded to the order by again denying that he had in his possession any relevant records. He also advanced the argument that his Fifth Amendment right to be free from government-compelled self-incrimination would be violated by enforcement of the order. The court considered and rejected that constitutional claim. On June 14, 1989, the government requested the imposition of fines of $1,000 per day "until Mr. Lehman produces the records." The district court ordered Lehman to be fined $500 per day beginning June 7, 1989, for as long as he did not comply with the court's order requiring compliance with the subpoena, "to include" the broader request for all bank statements issued in the court's April 24th order. The court denied the defendant's application for a stay of sanctions pending appeal.

Notice of appeal was filed on June 15, 1989. On July 21, 1989, this Court granted Lehman's motion for a stay of the civil contempt order imposing the continuing fine as a sanction pending the result of this appeal.

## II. Analysis

A. *Validity of the Original Subpoena*

Lehman maintains that enforcement of the subpoena would violate the Fifth Amendment because Lehman risks incriminating himself by producing any such records. Lehman suggests that the Supreme Court, in recent cases emphasizing the testimonial nature of the act of producing documents in response to government compulsion, has silently obliterated the doctrine that records which are required to be kept by law are not privileged. We disagree and follow the Sixth Circuit's reasoning that the required records exception must apply to the act of production. *Grand Jury Subpoena Duces Tecum, Underhill,* 781 F.2d 64, 67, 70 (6th Cir.1986), certiorari denied *sub nom. Underhill v. United States,* 479 U.S. 813, 107 S.Ct. 64, 93 L.Ed.2d 23 (1986), relying on the continuing validity of *Shapiro.* We also find that the documents originally sought by the government are required records.

We must first address Lehman's assertion that the Fifth Amendment will no longer support the required records doctrine. Lehman suggests that in producing the records he would be "testifying" as to their existence and to his control over them in a way that is protected by his Fifth Amendment privilege against self-incrimination. Lehman relies on *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Doe (Doe I ),* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), and *Doe v. United States (Doe II ),* 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988), a line of cases in which the Supreme Court emphasized that the act of producing potentially incriminating documents under government compulsion may have impermissible testimonial aspects. These cases might be applicable to this case were it not for the required records exception, since those cases teach that the Fifth Amendment protects against compulsory surrender of (1) personal business records, (2) in the possession of a sole proprietor or practitioner, (3) with respect to the testimonial act implicit in the surrender itself.

But none of those cases rejected the required records doctrine. We need not repeat here the argument clearly and persuasively laid out by the Sixth Circuit in *Underhill,* 781 F.2d at 69–70, to the effect that the Supreme Court has neither explicitly nor implicitly eliminated the required records doctrine. As the district court noted in this case, the purpose of any valid

---

4. Connery was not held in contempt apparently because the court thought it was less clear that he had withheld relevant records.

record-keeping requirement would be entirely frustrated unless required records may be inspected at the government's request. If the Supreme Court in its landmark Fifth Amendment cases intended to disarm many of the major regulatory enactments of the federal government, it would have addressed the question directly. See also *Shapiro*, 335 U.S. at 6–7, 68 S.Ct. at 1378–79 and n. 4 (Court lists twenty contemporary statutes, including the Packers and Stockyards Act, with broad record-keeping requirements).

■ The district court's finding that the original subpoena properly describes required records not sheltered by the privilege was proper. In order to insure that the government compels production of records only incident to the investigatory power necessary to support a valid regulatory scheme, the *Shapiro* required records doctrine is premised on three conditions: first, the purpose of the compulsion must be "essentially regulatory"; second, the records sought must contain the type of information that the regulated party would customarily keep; and third, the records must have "public aspects" making them at least comparable to public documents. *Grosso v. United States*, 390 U.S. 62, 67–68, 88 S.Ct. 709, 713–14, 19 L.Ed.2d 906 (1968) (interpreting *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375). As this Court has stated, our duty is to determine, first, whether the record-keeping requirement satisfies the three conditions and, second, "more generally whether it is directly incriminatory and targeted at those suspected of criminal behavior." *Bionic Auto Parts and Sales v. Fahner*, 721 F.2d 1072, 1082 (7th Cir.1983).

■ All three factors are applicable in the present case. In addition, the investigation is not essentially criminal in its focus. Passed by Congress to monitor the middlemen who arranged sale and shipment of cattle from the western ranges and farms to purchasers in the bustling and highly concentrated Chicago stockyards, the Act is a valid regulatory scheme. *Stafford v. Wallace*, 258 U.S. 495, 499–501, 513–15, 42 S.Ct. 397, 399–400, 401–02, 66 L.Ed. 735 (1922). The record suggests that the Administration is merely attempting to maintain that scheme in the investigation stalled by this case. There is nothing ordinarily criminally suspect in buying and selling livestock and, in the run of cases in which the Administration demands to see records of such sales, dealers will usually admit no criminal activity.

Second, the very language of the subpoena to Lehman, seeking records "pertaining to livestock buying and selling," limits the inquiry to exactly those records Lehman or anyone else would normally keep in the cattle dealing business. Lehman may or may not have records in a form the government seeks, but he cannot claim that such a request attempts to probe beyond the bounds of ordinary recordkeeping.

Finally, though the third prong of the test does not lend itself to analytical precision, the nature of the relationship between a cattle dealer and the Administration appears sufficient to imbue the financial records sought here with a "public aspect." Cf. *United States v. Porter*, 711 F.2d 1397, 1405 (7th Cir.1983), certiorari denied *sub nom. Wiggins v. United States*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (taxpayer's cancelled checks and deposit slips not sought by government on a regular basis were therefore lacking sufficient "public aspects" in tax investigation). Although the record does not disclose the specific nature or quality of the information a cattle dealer should be expected to keep, the keen health, safety, and economic interests of consumers, dealers, and regulators lend weight to the government's argument that the records of cattle dealing take on a public aspect. The Supreme Court has cautioned that constitutional requirements are not met merely because the government has "formalized its demands in the attire of a statute," *Marchetti v. United States*, 390 U.S. 39, 57, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968), but Lehman has not made a credible case that the statute or its execution in this instance attempt to treat as public any records that are inherently private. The relevant records sought by the government in this case are required

records. As such, Lehman admits nothing of significance by producing them that the government is not entitled to learn. Consequently the initial order for production was valid.

### B. *The District Court's All–Inclusive Order*

■ After Lehman failed to produce any documents in response to the subpoena, the district court ordered Lehman to comply with the subpoena. In its order of November 29, 1988, the district court properly found that the subpoena was reasonable both in its scope and in the time period over which the materials were requested in compliance with *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Five months later, convinced that Lehman was refusing to turn over records in his possession relevant to a proper investigation, the district court found Lehman in civil contempt of court. Intent on closing "loopholes" Lehman might use to hide information, such as commingling irrelevant information with the records in question, the district court expanded the order to include all of Lehman's personal banking records. The court found that they were "reasonably related to the regulated business in which he is involved."

There is no doubt that the district court possessed the authority to enforce the subpoena through coercive penalties pursuant to the Act.[5] Nor did it abuse its discretion in finding Lehman in contempt based on documentary evidence and testimony that Lehman refused to produce required records that would certainly be within the focus of the investigation delineated by the Administration.

In its final exercise of authority and contempt power, however, the district court attempted to coerce Lehman to produce records beyond those requested as part of the valid administrative investigation, producing a case that is the converse of that in which a district court attempts to modify or exclude portions of an unduly burdensome or unreasonably broad administrative subpoena. *Federal Trade Commission v. Shaffner*, 626 F.2d 32, 38 (7th Cir.1980) (district court erred in limiting FTC investigation). Therefore it must be determined whether the district court's extension of the reach of the subpoena was unreasonable under the Fourth Amendment. See *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946); *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1267, 1269 n. 10 (7th Cir.1982).[6]

---

**5.** Section 402, 7 U.S.C. § 222, of the Act adopts the provisions of Sections 6, 8–10 of the Federal Trade Commission Act, Title 15, so that the access and subpoena powers of the FTC are by reference incorporated into the Packers and Stockyards Act. The subpoena at issue here takes its authority from Section 9 of the Trade Commission Act. Lehman does not challenge the fundamental authority of the Administration to issue subpoenas in civil enforcement actions, though his Fifth Amendment challenge would eviscerate the investigatory function. Section 9 states in relevant part:

> [T]he Commission shall have power to require by subpoena ... the production of all ... documentary evidence relating to any matter under investigation....
>
> .    .    .    .    .
>
> And in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring ... the production of documentary evidence.
>
> Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in the case of contumacy or refusal to obey a subpoena is-

sued to any person ... issue an order requiring such person ... to produce documentary evidence if so ordered ...; and any failure to obey such order of the court may be punished by such court as a contempt thereof (15 U.S. C. § 49).

Section 10 states in relevant part:

> Any person who shall ... refuse ... to produce any documentary evidence, if in his power to do so, in obedience to an order of a district court of the United States directing compliance with the subpoena or lawful requirement of the Commission, shall be guilty of an offense and upon conviction thereof by a court of competent jurisdiction shall be punished by a fine of not less than $1,000 nor more than $5,000, or by imprisonment for not more than one year, or by both such fine and imprisonment (15 U.S.C. § 50).

Thus Congress enlisted the aid of the federal courts to enforce the subpoena power of the Packers and Stockyards Administration.

**6.** Some courts suggest that the constitutional restriction on overbroad subpoenas *duces tecum* may be based more solidly on the due process clause than on the Fourth Amendment. See,

The district court's reach cannot logically extend beyond the power of the Administration to subpoena records in the first instance since the court's statutory authority was only to "direct compliance with" a legitimate subpoena. Therefore, the question is whether a subpoena as rewritten along the lines drawn by the district court, at the behest of the government, would be enforceable. In answering that question, the Court is guided by the principles that a finding by a district court that subpoenaed documents are reasonably relevant to a legitimate agency purpose must be sustained absent a showing that the factual determinations on which that finding is based are clearly erroneous, or that the district court's finding is itself an abuse of discretion. *Dow Chemical Co.*, 672 F.2d at 1267 (citations omitted).[7] There it was recognized that determining whether enforcement would be reasonable "requires juxtaposition of need and probative value against burden of compliance." 672 F.2d at 1270.

The Supreme Court's reading of Section 9 of the Federal Trade Commission Act as granting the government broad subpoena power is also pertinent. *Oklahoma Press*, 327 U.S. at 201, 66 S.Ct. at 501. There the Court ruled that so long as subpoenas issued pursuant to an investigation by the Wage and Hour Administrator under the Fair Labor Standards Act were part of an investigation authorized by Congress, for a purpose Congress could order, seeking documents relevant to the inquiry, and reasonably specific in their terms, the subpoenas were entitled to enforcement. *Id.* at 209, 66 S.Ct. at 505. As the Court of Appeals for the District of Columbia Circuit has emphasized, the question is whether, under this liberal standard, the demand is unduly burdensome or unreasonably broad. *Federal Trade Commission v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C.Cir.1977), certiorari denied *sub nom. Standard Oil Co. v. Federal Trade Comm.*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), rehearing denied, 434 U.S. 883, 98 S.Ct. 250, 54 L.Ed.2d 168 (1977).

The district court's order in this case was unreasonably broad. The Administration's inquiry is not so comprehensive as to justify a demand for all of Lehman's personal banking records. The district court did not order Lehman to turn over those personal banking records touching on cattle dealing. Instead, the court ordered production of all personal banking information, allowing the Administration to draw from that amalgam of personal banking information whatever records it deems relevant. Existence of evidence that could lead to a finding that some of Lehman's personal and cattle-related records were intertwined is not sufficient cause to order the production of all of Lehman's personal records. Responding to an alleged contemnor's refusal to produce records under the mandate of a properly tailored subpoena by creating an unreasonably broad subpoena is an abuse of discretion because it needlessly defeats reasonable expectations and undermines the legitimacy of the administrative investigatory system. The Administration is entitled to stage an extremely wide-ranging investigation, see *United States v. Morton Salt*, 338 U.S. 632, 642, 70 S.Ct. 357, 363, 94 L.Ed. 401 (1950), but it is not entitled to demand irrelevant documents in order to punish Lehman for refusing to turn over relevant ones.

Prior cases addressing this issue have not typically involved such sweeping demands on livestock dealers. Enforcement

---

*e.g., In re Grand Jury Proceedings, McCoy*, 601 F.2d 162, 170 n. 5 (5th Cir.1979) (reversing contempt orders due to overly broad subpoenas). There is no need in this case to determine which is the stronger theoretical thread, since our decision does not turn on the difference between those requirements.

Our decision is also informed, of course, by our prior discussion of the required records doctrine of Fifth Amendment law. Records pertaining to cattle dealing are required records.

But it is far from clear how the Lehman family's money orders, savings account withdrawal slips, and other personal banking information over the 17–month period could be called required records.

**7.** *Dow Chemical* of course involved an adjudicative subpoena issued by an administrative law judge, rather than an investigatory subpoena, and the Court noted that "the bounds of relevance" are somewhat broader in the investigatory context. 672 F.2d at 1268.

has been granted in cases in which the government limited its inquiry, as it did initially in this case, to subpoenas requiring records "pertaining to" activities regulated under the Act. *United States v. Jay Freeman Co.*, 473 F.Supp. 1265 (E.D.Ark.1979) (" 'pertaining to the purchase and sale of meat and meat food products' "); *United States v. Packerland Packing Co.*, 345 F.Supp. 329 (E.D.Wis.1972), affirmed, 478 F.2d 1405 (7th Cir.1973) (" 'pertaining to the purchase and sale of livestock, meat, and meat food products' "); *United States v. Tyson's Poultry, Inc.*, 216 F.Supp. 53 (W.D.Ark.1963) (" 'in connection with the acquisition of live poultry or poultry products' "); cf. *C.P. McGloshen v. United States Department of Agriculture*, 480 F.Supp. 247 (W.D.Ky.1979) (district court approves broad subpoena without directly discussing reasonableness).

While it is true that the bank records sought are not private documents in the sense that a personal journal or letter would be, they would likely include all manner of personal and business transactions conducted by members of the Lehman family, some not even remotely associated with the government inquiry. The district court stretched its authority to the breaking point in complying with the government's request to demand all the personal banking records of Lehman's family. This was done despite the fact that in its December 29, 1988 order limiting the demand for tax records to those relating to the inquiry, the district court appeared to recognize the need for some restraint on the government's inquiry.

Lehman may not escape the scrutiny of the investigation simply by commingling private records and required records. If the district court should be convinced that Lehman hides within his personal banking records information relevant to the investigation, the court has the full coercive power of civil contempt at its disposal without requiring an overbroad production. If prosecutorial authorities of any relevant jurisdiction became sufficiently interested in the possible fraud suggested by the investigation to subpoena bank or other records, that would be a different case.

But to allow a search through all of Lehman's banking records of whatever type under the guise of an administrative investigation pursuant to the Act would not be a proper use of the required records doctrine. The bulk of the records requested under the district court's final expansive order are neither definite nor reasonably relevant. See *Morton Salt Co.*, 338 U.S. at 652, 70 S.Ct. at 368.

### III. Conclusion

The district court's orders of November 29, 1988, December 29, 1988, and its contempt finding of April 20, 1989 are hereby affirmed. The contempt order of April 24, 1989, is remanded to the district court for modification consistent with this opinion.