**In re: SPECIAL FEBRUARY 2011–1 GRAND JURY SUBPOENA DATED SEPTEMBER 12, 2011.**

**No. 11 GJ 792.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 22, 2011.

*MEMORANDUM OPINION AND ORDER*

JAMES F. HOLDERMAN, Chief Judge:

The movant in this matter was personally subpoenaed to testify and produce records before the grand jury. He was told by the Government that he is a target of the grand jury's investigation (hereinafter referred to as "T.C." for Target Citizen).

T.C. has moved to quash the subpoena based on his Fifth Amendment privilege against incrimination. The Government has opposed the motion. For the following reasons, the motion to quash is granted.

## BACKGROUND

The grand jury as a part of its investigation of T.C. issued the subpoena dated September 12, 2011 that is the subject of T.C.'s motion. That subpoena in addition to seeking T.C.'s testimony [1] compels him to produce "any and all" of his foreign financial account records covering the time period from October 1, 2006, to the present. Under the regulations authorized by the Bank Secrecy Act (BSA), 31 U.S.C. §§ 5311–5332, any foreign financial account holder is required to keep records of his foreign financial accounts and to file annual reports with the IRS. The subpoena at issue specifically commands T.C. to appear and testify before the grand jury and bring with him the following:

> [a]ny and all records required to be maintained pursuant to 31 C.F.R. § 103.32 [subsequently relocated to 31 C.F.R. § 1010.420] relating to foreign financial accounts that you had/have a financial interest in, or signature authority over, including records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.

The records that the subpoena compels contain information T.C. was required to report concerning his foreign financial accounts to the IRS annually for the years he held such accounts by filing Form TD F 90–22.1, the "Report of Foreign Bank and Financial Accounts" (FBAR). T.C. declined to provide that information on his 2009 and 2010 FBAR forms, citing his Fifth Amendment privilege against self-incrimination. It appears that T.C. did not file the form in 2006, 2007, or 2008. Transcript of Nov. 8, 2011 Hearing at 8:13–9:1 (under seal).

## ANALYSIS

■ The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." There is no dispute here that the contents of the subpoenaed documents enjoy no Fifth Amendment privilege. Because the foreign banks holding T.C.'s accounts created the documents that the government seeks, the documents do not include T.C.'s testimony, much less his compelled testimony. *See United States v. Hubbell*, 530 U.S. 27, 36, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000). Nonetheless, T.C.'s "act of producing documents in response to a subpoena may have a compelled testimonial aspect," if producing the documents would require T.C. to "admit that the papers existed, were in [T.C.'s] possession or control, and were authentic." *Id.* Here, T.C. contends, and the Government does not dispute, that producing the requested records would be an admission by T.C. that he has one or more foreign bank accounts and that he had knowledge of the account or accounts that he held during the period covered by the subpoena. That information incriminates T.C. if he failed to report those foreign accounts properly to the IRS or failed to pay the proper amount of tax due from the income generated by those for-

---

1. The Government in its Response stated it extended the date for T.C.'s compliance and stated, "His [T.C.'s] personal appearance was also tentatively excused in the event documents were produced assuming the documents were properly authenticated." (Govt. Resp. 1, fn. 1.)

eign accounts. *See* 26 U.S.C. § 7206(1); 31 U.S.C. § 5322; 31 C.F.R. § 1010.350(a).

■ Even though T.C.'s act of production may be incriminating, the Government contends that the Fifth Amendment does not apply in this instance under the required records doctrine. That doctrine provides an exception to the Fifth Amendment privilege for "records which are required to be kept by law." *United States v. Lehman*, 887 F.2d 1328, 1332 (1989). The Supreme Court first recognized the required records doctrine in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), a case requiring the production of a fruit wholesaler's price records required by law to be maintained and open to Government inspection. Because the Government had a legitimate regulatory interest in the price records (for the enforcement of emergency war-time price controls), the Supreme Court reasoned, "the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of Governmental regulation, and the enforcement of restrictions validly established.'" *Id.* at 33, 68 S.Ct. 1375 (footnote omitted). The Supreme Court later interpreted *Shapiro* to establish a three-part test for the application of the required records doctrine: "first, the purpose of the compulsion must be 'essentially regulatory'; second, the records sought must contain the type of information that the regulated party would customarily keep; and third, the records must have 'public aspects' making them at least comparable to public documents." *Lehman*, 887 F.2d at 1332 (citing *Grosso v. United States*, 390 U.S. 62, 67–68, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968)).

The Ninth Circuit recently applied the three-part test to enforce a subpoena identical to the one in this case requesting foreign bank account records maintained under 31 C.F.R. § 1010.420. *In re M.H.*, 648 F.3d 1067, 1070 (9th Cir.2011). The Ninth Circuit applied the required records doctrine after concluding that all three prongs of the test were met. The Ninth Circuit reasoned, first, "[n]othing about having a foreign bank account on its own suggests a person is engaged in illegal activity," so the requirement to maintain records was "essentially regulatory," rather than criminal. *Id.* at 1074. Second, investors in foreign banks would typically keep basic information about their accounts, thus making the records "customarily kept." *Id.* at 1076. Finally, the Ninth Circuit held that "[w]here personal information is compelled in furtherance of a valid regulatory scheme ..., that information assumes a public aspect," and found the third prong was met as well. *Id.* at 1077. Consequently, the Ninth Circuit affirmed the district court's order requiring M.H.'s compliance with the subpoena.

The question here regarding the subpoena to T.C. is not as straightforward as the subpoena to M.H. The Seventh Circuit, unlike the Ninth, has recognized that the application of the required records doctrine has become more complex in the more than half a century since the Supreme Court decided *Shapiro*. To understand the complexity, one must recall that *Shapiro* was decided under the regime of *Boyd v. United States*, a nineteenth-century case which established the now-discredited rule prohibiting all compelled production of incriminating documents in private hands. 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). When that rule was the law of the land, there was a concern that the Government lacked the investigative tools necessary to enforce many of its legitimate regulatory regimes. *See* Richard A. Nagareda, *Compulsion "To Be a Witness" and the Resurrection of* Boyd, 74

N.Y.U. L. Rev. 1575, 1643–44 (1999). The need for an exception to *Boyd*'s categorical rule was thus plain. Moreover, the rationale behind *Boyd* focused on an owner's right of privacy in his possessions.[2] It therefore made sense, at that time, to carve out the necessary exception by focusing on the attributes that distinguish "public" documents from "private." And indeed, the Supreme Court in *Shapiro* proceeded along precisely those lines when establishing the required records doctrine, stating that "there is an important difference in the constitutional protection afforded their possessors between papers exclusively private and documents having public aspects, a difference whose essence is that the latter papers, once they have been legally obtained, are available as evidence." *Shapiro*, 335 U.S. at 33–34, 68 S.Ct. 1375 (quotation marks and citation omitted). The three-part test distills the Supreme Court's reasoning in *Shapiro* by distinguishing public documents from the private property protected under *Boyd*.

The problem with the *Shapiro* three-part test today is that the *Boyd* principle no longer defines the parameters of the Supreme Court's application of the Fifth Amendment.[3] Instead of focusing on an individual's right to shield his private property from Government inquiry, the Su-preme Court has recognized that the Fifth Amendment protects "a person only against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *see also id.* at 401, 96 S.Ct. 1569 ("We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy—a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against 'compelled self-incrimination, not (the disclosure of) private information.'" (citation omitted)). The Supreme Court's focus on whether a communication is "testimonial" led it to abandon the *Boyd* rule and to recognize that there is no privilege protecting the contents of documents, so long as their creation was the author's voluntary choice. *Id.* at 407–09, 96 S.Ct. 1569. In other words, when a person has already made an incriminating statement in a document, the mere production of the document does not require the producing person to restate the document's contents. Nonetheless, the Supreme Court has recognized that a document may still be protected from compelled production because the act of producing the document may

---

**2.** *See Boyd*, 116 U.S. at 627–28, 6 S.Ct. 524 (" 'Papers are the owner's goods and chattels; they are his dearest property, and are so far from enduring a seizure, that they will hardly bear an inspection ....' " (quoting *Entick v. Carrington and Three Other King's Messengers*, (1765) 95 Eng. Rep. 807 (K.B.); 19 How. St. Tr. 1029)); *see also Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("The Fourth and Fifth Amendments were described in *Boyd* as protection against all Governmental invasions 'of the sanctity of a man's home and the privacies of life.' " (citation omitted)); 3 Wayne LeFave et al., *Criminal Procedure* § 8.12(a) (3d ed. rev. 2010) ("*Boyd* relied on what has been described as a 'property oriented' view of the Fourth and Fifth Amendments, built upon the owner's right of privacy in the control of his lawfully held possessions. It recognized a special Fifth Amendment interest in the privacy of documents, viewing the forced production of their contents as equivalent to requiring a subpoenaed party to reveal that content through his testimony." (footnote omitted)).

**3.** *See* Samuel A. Alito, Jr., *Documents and the Privilege Against Self–Incrimination*, 48 U. Pitt. L. Rev. 27, 39–40 (1986) ("*Boyd*'s property-based interpretation of the fourth amendment could not accommodate the needs of modern law enforcement or modern concepts of privacy."). *See generally* 1 Sara Sun Beale et al., *Grand Jury Law and Practice* § 6:14 (2d ed. 2008) (describing the erosion of *Boyd*).

have testimonial aspects, such as an admission that the document is authentic. *United States v. Doe*, 465 U.S. 605, 612–13, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).

In that context, the distinction between public and private documents that formed the foundation of *Shapiro* can no longer be the dominant rationale for the required records doctrine. *See* Alito, *supra* note 3, at 71–72 ("The required records rule ... also seems likely to be reexamined in light of *Fisher* and *Doe*, because this rule ... was developed without any consideration of the act of production."). Indeed, the Seventh Circuit in 1989 considered doing away with the doctrine because of *Fisher* and *Doe*. *See Lehman*, 887 F.2d at 1332. Although the Seventh Circuit retained the required records doctrine, it did so by articulating two new rationales for its existence in light of *Fisher* and *Doe*.

First, the Seventh Circuit in *Smith v. Richert* tied the required records doctrine to *Doe*'s emphasis on the testimonial aspects of production, noting that if the law requires an individual to keep documents, "the only acknowledgment conveyed by [producing them] would be of the existence and applicability of the regulatory program that required him to maintain the records," an acknowledgment that is not incriminating. 35 F.3d 300, 302 (7th Cir. 1994); *accord In re Grand Jury Subpoena Duces Tecum Served Upon Underhill*, 781 F.2d 64, 70 (6th Cir.1986) ("[B]ecause required records must have taken on a 'public aspect' and because the law requires that they be kept, an individual admits little of significance by producing them."); *see also Lehman*, 887 F.2d at 1332 (adopting the Sixth Circuit's reasoning in *Underhill*). The Seventh Circuit thereby established that in general, the production of required records will lack the testimonial significance that protects a subpoenaed witness's refusal to produce some documents under *Fisher* and *Doe*.

The second rationale squares the required records doctrine with *Fisher*'s focus on the voluntariness of the individual's testimony. One might assume that the maintenance and production of all "required" records would by definition be compelled and thus not voluntary. The Seventh Circuit reasoned, however, that so long as the individual has voluntarily chosen to enter a regulated field, the maintenance or production of any records under the compulsion of government regulation of that field is also voluntary. *See Smith*, 35 F.3d at 302–03 (explaining the voluntariness requirement and reasoning that it is met by "the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity"); *Underhill*, 781 F.2d at 70 ("[I]f an individual chooses to begin or continue to do business in an area in which the government requires record keeping, he may be deemed to have waived any Fifth Amendment protection.").

Although the *Shapiro* three-part test remains viable after *Fisher* and *Doe*, *see Lehman*, 887 F.2d at 1333, one can discern from the Seventh Circuit's new rationales for the required records doctrine two additional factors that may make the required records exception inapplicable even when the three-part test is met. The first factor is whether the individual's compelled production of the subpoenaed records causes him to admit any incriminating fact beyond the mere existence and applicability of the regulatory program that requires the records' maintenance and production. The second factor is whether the individual claiming Fifth Amendment protection has voluntarily entered the field of regulation by the government so as to waive Fifth Amendment protection from any production that the government's regulatory scheme may require.

This latter factor is the main rationale behind the Seventh Circuit's decision that the required records doctrine does not cover individual taxpayers' domestic tax records. *See Smith,* 35 F.3d at 303 ("The decision to become a taxpayer cannot be thought voluntary in the same sense [as the decision to enter upon a regulated activity]. Almost anyone who works is a taxpayer, along with many who do not."). This factor does not present an obstacle to the application of the required records doctrine here, however. Only about half a million taxpayers choose to use foreign bank accounts each year, so the activity of foreign bank account usage lacks the near universality of the decision to earn sufficient income to become a taxpayer. *See In re M.H.,* 648 F.3d at 1074. Moreover, T.C.'s counsel conceded at the November 8, 2011 closed hearing on the motion to quash that T.C.'s decision to put funds in a foreign bank account was voluntary. Transcript of Nov. 8, 2011 Hearing at 6:6–10 (under seal).

Consequently, the issue to be decided regarding T.C.'s pending motion is whether T.C.'s compelled production of the subpoenaed records causes him to admit any incriminating fact beyond the mere existence and applicability of the regulatory program. On that point, this court finds that T.C.'s compelled production of the subpoenaed information would compel him to admit that he has an interest in one or more foreign bank accounts and that he is thus participating in the regulated activity.[4] As described above, that fact may incriminate him under 26 U.S.C. § 7206(1) and 31 U.S.C. § 5322.

In the typical required records case, of course, there is no danger that producing the required records will compel the individual engaging in the regulated activity to admit his participation in the regulated activity, for that fact is usually obvious. The individual's participation in the regulated activity is obvious because in the typical case, the individual engages in the regulated activity in public. In the *Shapiro* case itself, for example, the fruit wholesaler subject to the price controls conducted his business in public and with the public, so the Government already knew that he was, in fact, a fruit wholesaler subject to the regulations. The same could be said of all of the typical entities found to be subject to production under the required records doctrine. *See, e.g., In re Grand Jury Subpoena,* 21 F.3d 226 (8th Cir.1994) (regulation of an automobile dealer); *Lehman,* 887 F.2d at 1330 (cattle dealer); *Underhill,* 781 F.2d at 65 (automobile dealer); *United States v. Scherer,* 523 F.2d 371 (7th Cir.1975) (firearms dealer); *United States v. Rosenberg,* 515 F.2d 190, 199–200 (9th Cir.1975) (physician). In all of those cases, the very purpose of the regulations was to protect consumers and the public from the individuals engaged in domestic commercial activity in the public market.

By contrast, the purpose of the BSA, according to its statutory declaration of purpose, is not to regulate a public market or to protect consumers, but rather to advance the Government's "criminal, tax, or regulatory investigations or proceedings," or to "protect against international terrorism." 31 U.S.C. § 5311. The people subject to BSA regulation have not

---

4. The court notes that this compelled self-incriminating admission is different from a non-self-incriminating admission that the regulatory program is applicable to taxpayers who have an interest in foreign bank accounts. The self-incriminating admission that the Fifth Amendment protects here is a compelled admission by T.C. to the grand jury that reveals he himself has an interest in a foreign bank account and is thus one of those taxpayers.

necessarily engaged in activities with the public or in the public sphere. An individual's voluntary decision to obtain a foreign bank account is private, unlike the voluntary decision to conduct business with the public in a regulated area. Without some disclosure by the individual such as the FBAR—which in this case T.C. has declined to fill out—the Government has no direct way to discover T.C.'s participation in the regulated activity.[5] Forcing T.C. to produce the foreign bank account records would compel him to admit that he has a foreign bank account, a compelled admission that the Fifth Amendment protects him from having to make.[6]

■ A bedrock principle of Fifth Amendment jurisprudence is that the Government cannot obtain access to information merely by expressing its "anxiety to obtain information known to a private individual," or even by "formaliz[ing] its demands in the attire of a statute." *Marchetti v. United States,* 390 U.S. 39, 57, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). Thus, "a statute that required all Americans to keep a diary in which they recorded every arguably illegal act that they committed, or make a tape-recorded confession whenever they committed an illegal act, would not empower the authorities ... to compel the production of the diary or the tape." *Smith,* 35 F.3d at 303. The required records doctrine establishes a limited exception to that principle by allowing the government to compel the production of certain information merely by formally demanding the information in a statute. The required records doctrine only applies, however, in the limited case in which the individual's decision to participate in a regulated activity has already revealed the information that he seeks to protect under the Fifth Amendment. To expand the required records doctrine beyond that restricted class of cases would erode the protection that, in the words of Justice Joseph Story in his landmark *Commentaries on the Constitution,* "is of inestimable value." The origin of that protection, Justice Story reminded us, is to avoid the fate of countries in which, "not only are criminals compelled to give evidence against themselves, but are subjected to the rack or torture in order to procure a confession of guilt." 3 Joseph Story, Commentaries on the Constitution § 1782 (1833), *in* 5 The Founders' Constitution 295, 296 (Philip B. Kurland & Ralph Lerner eds., 1987). If such important protection can be eroded "*merely* because [records are] required to be kept by law ...," we are indeed living in glass houses." *Shapiro,* 335 U.S. at 50, 68 S.Ct. 1375 (Frankfurter, J., dissenting) (emphasis added). The Government must do more work than simply requiring T.C. to incriminate himself by producing his own files if it wishes to find evidence during this grand jury investigation that T.C.

---

**5.** If the Government could discover the information from a third-party or through other investigation, such as from a foreign bank, if any, in which T.C. has invested. The Government may argue that it is difficult to obtain the information from a third-party in this case, given that all of the relevant information is overseas and protected by foreign banks. The Government's difficulty in otherwise obtaining the subpoenaed information, however, is not a reason to eviscerate an individual's Fifth Amendment protection.

**6.** The private nature of opening a foreign bank account also casts doubt on whether the account records meet the "public aspects" prong of the *Shapiro* three-part test. The Seventh Circuit has stated that records have "public aspects" if they "are usually known to the public in general rather than records which are essentially personal to the individual." *United States v. Campos–Serrano,* 430 F.2d 173, 176 (7th Cir.1970). The fact that an individual maintains a foreign bank account and the records thereof are not "usually known to the public in general."

has an incriminating interest in foreign bank accounts.

## CONCLUSION

For the reasons stated above, T.C.'s motion to quash the subpoena is granted.

