**In re GRAND JURY SUBPOENA DUC-ES TECUM DATED MAY 9, 1990.**

**No. M 11–189.**

United States District Court,
S.D. New York.

June 20, 1990.

Motion to Modify or Withdraw Opinion
Denied Sept. 20, 1990.

See also, 683 F.Supp. 78.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for U.S.; Avraham C. Moskowitz, Asst. U.S. Atty., of counsel.

Kostelanetz Ritholz Tigue & Fink, New York City by Robert S. Fink, Charles David Kreps, Jr., for movant.

## OPINION

SWEET, District Judge.

Defendant has moved to quash a grand jury subpoena pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. For the reasons set forth below the motion is granted.

*The Instant Motion*

Defense counsel accepted a grand jury subpoena *duces tecum* on behalf of movant, requiring movant to appear before the grand jury on May 18, 1990. The subpoena orders production of "any and all diaries, appointment books and telephone and address books" maintained by movant during the period from January 1, 1978 through December 31, 1984 and all tape recordings of conversations between movant or co-defendant and any vendor or contractor who did or sought to do business with a certain corporation (the "corporation") during the same time period. The government represents that it has cause to believe that these materials may contain evidence of movant's

soliciting and receiving kickbacks from various vendors who did business with the corporation, including those named in the indictment and others unnamed or unknown to the government.

By consent of the government, the appearance date was adjourned to enable movant to make this motion which was heard on May 25, 1990 and, along with the letters of May 31, June 4, and June 6,. considered submitted as of that date.

At the hearing, the government offered movant immunity for the act of production of the subpoenaed materials. Movant established by affidavit that the subpoenaed materials were personal to him and that the tape recordings were made after the termination of his employment with the corporation.

*Prior Proceedings*

On April 27, 1990, the government in a four-count indictment, charged movant with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and two counts of subscribing to false income tax returns for tax years 1983 and 1984, in violation of 26 U.S.C. § 7206(1). The indictment alleges that movant extorted kickbacks from two vendors who did business or sought to do business with the corporation. The indictment further alleges that movant failed to report those kickbacks as income on his income tax returns for tax years 1983 and 1984.

In the fourth count, the indictment also charges co-defendant with subscribing to a false income tax return for the tax year 1983. Co-defendant pled guilty to this count on June 4, 1990 and entered into a cooperation and plea agreement with the government.

█ Since the return of the initial indictment, the government has continued its investigation of movant's activities at the corporation with the alleged intent of seeking a superseding indictment against him should additional evidence of criminal conduct be uncovered. As a result of this ongoing investigation, the government obtained information concerning additional vendors involved with kickbacks and other payments to movant and now possibly seeks to indict others.[1]

The government has alleged that it seeks the materials subpoenaed to bring a superseding indictment which would broaden the scope of the conspiracy charge in the existing indictment and add additional tax fraud charges against movant and possibly others.

On April 20, 1989, one week before charges were filed against movant, movant's counsel met with a trial attorney at the Tax Division of the Department of Justice in Washington, D.C. to present evidence to the government on behalf of movant in an attempt to dissuade the government from bringing the indictment. Counsel's representations included assertions about vendors interviewed by counsel who stated that they had never provided gratuities of any sort to movant and information about various persons already known to the government.

*The Issues*

Movant seeks to quash the subpoena on the grounds that the government's dominant and improper purpose in issuing the subpoena is to discover evidence for use at trial against movant and that the materials sought to be produced in the grand jury are private and as such will fall within movant's invocation of the Fifth Amendment's protection against self-incrimination.

*I. The Purpose of the Grand Jury Subpoena*

It is well-settled that "[i]t is clearly 'improper to utilize a Grand Jury for the sole

---

1. By letter of May 31, 1990 movant also seeks to quash a Government subpoena issued to a non-party, a former vendor to the corporation named in the indictment against movant. Although considered as part of the evidence submitted in movant's motion to quash his own subpoena, movant has no standing to quash the non-party's subpoena. *Ponsford v. United States,* 771 F.2d 1305, 1308 (9th Cir.1985) (absent proprietary interest in documents sought, no standing to quash); *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir.1975) (absent claim of privilege, party usually has no standing to object to subpoena directed at non-party).

or dominating purpose of preparing an already pending indictment for trial.'" *United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir.1989) *cert. denied*, — U.S. ——, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990) (quoting *Payden v. United States (In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels))*, 767 F.2d 26, 29 (2d Cir.1985) and *United States v. Dardi*, 330 F.2d 316, 336 (2d Cir.1964), *cert. denied*, 379 U.S. 845, 869, 85 S.Ct. 50, 117, 13 L.Ed.2d 73 (1964)).

█ In the absence of a factual showing to the contrary, however, there is a presumption of regularity of the grand jury proceedings, *see In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir.1980), and it is entirely proper to issue grand jury subpoenas following the return of an initial indictment if the grand jury is continuing its investigation with the purpose of considering a superseding indictment. *See Vanwort*, 887 F.2d at 387; *In re Grand Jury Subpoenas of Clay*, 603 F.Supp. 197, 200–201 (S.D.N.Y.1985); *In re Grand Jury Subpoena Dated November 9, 1979*, 484 F.Supp. 1099, 1101 (S.D.N.Y.1980).

Of course, it "is difficult, if not impossible, to enforce" the rule barring use of the grand jury to gather evidence improperly for trial in view of the propriety of the authority to use the grand jury to garner evidence for a superseding indictment. *Simels*, 767 F.2d at 30 (citing 8 J. Moore, *Moore's Federal Practice* ¶ 6.04[5] at 6–86 (1984)). Absent some clearly indicative sequence of events such as those present in *Simels*, a court will be faced with having to take at face value the government's word that the dominant purpose is proper, even when the subpoena will inevitably produce evidence applicable to prosecuting the existing indictment pending trial.

█ Movant urges that because the indictment was returned one week after movant's counsel demonstrated to the Department of Justice the "many weaknesses and flaws in the Government's case" and because one week after the indictment the government was told that trial would be set for June 25, just seven weeks away, that the government "suddenly found itself facing imminent trial on a case riddled with problems." Although movant's self-serving interpretation of the sequence of events may be entirely plausible, the government has represented to the court that the grand jury investigation is continuing and that after the return of the indictment, additional evidence developed indicating that movant received kickbacks from vendors not named in the current indictment.[2]

According to the government, this new information, when developed, is likely to result in the government's request for the grand jury to vote a superseding indictment against movant and possibly others. Although the subpoena calls for the production of recordings and documents which relate to the charges contained in the initial indictment, the government believes that the evidence contained in these materials may enable the grand jury to revise the conspiracy count to charge additional overt acts involving the vendors already named in the indictment. The government also believes that the material may contain evidence of specific payments to movant which might enable the grand jury to charge movant with income tax evasion, in violation of 26 U.S.C. § 7201, in addition to the false subscribing charges already contained in the initial indictment.

Accordingly, although the materials requested may well relate to issues relevant to the existing indictment, because of the government's representations, there is no basis on which to conclude that the government's dominant purpose is preparation for trial, rather than investigation for the purpose of superseding the existing indictment. The motion to quash on the basis of improper purpose is denied.

## II. The Fifth Amendment

█ Movant also claims that the grand jury subpoena calling for the production of tape recordings and documents prepared

---

**2.** Although movant finds the failure of the government to name the additional vendors as indicative of an improper motive, the government is not obliged to name those suspected as additional co-conspirators to justify the issuance of the subpoena.

by movant and characterized by him as personal violates his Fifth Amendment right against self-incrimination despite the government's assurance that the government will seek a court order granting movant act-of-production immunity.

### A. The Fisher–Doe Approach

The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself...." U.S. Const. Amend. V. Since 1886, when the Supreme Court enunciated in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), that a subpoena was analogous to a search, an individual's private papers have been protected absolutely from subpoenas for documents by the privilege against self-incrimination. *Boyd*, 116 U.S. at 633, 6 S.Ct. at 533. The expansive view of the Fourth and Fifth Amendments contemplated by the Court in *Boyd*, and clarified further in *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), however, has been altered considerably, and with respect to the Fourth Amendment, explicitly discarded. *See Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 301–302, 87 S.Ct. 1642, 1647–1648, 18 L.Ed.2d 782 (1967). *See also Fisher v. United States*, 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976) ("foundations of the 'mere evidence' rule have been washed away" and "[s]everal of *Boyd*'s express or implicit declarations have not stood the test of time"). Nonetheless, according to movant, the century-old pronouncement concerning the privilege for a person's private papers is still the law today. According to the Government, recent Supreme Court cases setting forth the Court's current analytical approach to the scope of the Fifth Amendment's protection against compelled self-incrimination question the continued vitality of *Boyd* with respect to Fifth Amendment protection for the production of private documents.

In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Supreme Court held that "the Fifth Amendment would not be violated by the [compelled production of] papers [which] on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communication." *Id.* at 409, 96 S.Ct. at 1580. Fisher involved Internal Revenue summonses of an accountant's workpapers relating to the preparation of the tax returns of taxpayers under investigation, when the taxpayers had given the accountant's papers to the taxpayers' attorney. In rejecting the taxpayers' claim of privilege, the Court stated that for the privilege to apply there must be testimonial communication, compulsion, and incrimination. *Id.* at 408, 96 S.Ct. at 1579. The Court emphasized that where "the preparation of ... the papers sought in these cases was wholly voluntary ... they can not be said to contain compelled testimonial evidence, either of the [person subject to subpoena] or of anyone else." *Id.* at 409–10, 96 S.Ct. at 1580–81 (footnote omitted).[3]

---

**3.** In the companion case of *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Court held that the seizure of a defendant's business records did not compel him to be a witness against himself because the defendant was not compelled to create the records but had "voluntarily committed [them] to writing" and therefore at the time of seizure or at the introduction of the evidence the defendant was not "asked to say or to do anything." *Id.* at 473, 96 S.Ct. at 2745. The reasoning in both *Fisher* and *Andresen* concludes that the Fifth Amendment privilege does not protect the contents of voluntarily prepared business records. Neither case, however, resolves the content/act-of-production dichotomy and thus both suggest that the Constitution may protect some personal papers from subpoena. *See*

Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 947 (1977) (hereinafter "Formalism"). For example, the Court in *Andresen* recognized that "[t]he 'historic function' of the privilege has been to protect ' "a natural individual from compulsory incrimination through his own testimony or personal records." ' " *Andresen*, 427 U.S. at 470–71, 96 S.Ct. at 2743–44, (quoting *Bellis v. United States*, 417 U.S. 85, 89–90, 94 S.Ct. 2179, 2183–84, 40 L.Ed.2d 678 (1974), quoting *United States v. White*, 322 U.S. 694, 701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944)). In *Fisher*, the Court expressly declined to address the question of whether the content of "private papers" is protected by the Fifth Amendment. *Fisher*, 425 U.S. at 414, 96 S.Ct. at 1582. Similarly, in

The *Fisher* Court concluded the act of production did not involve testimonial self-incrimination because the existence and location of the papers were a "foregone conclusion" and thus production added "little or nothing to the sum total of the Government's information...." *Id.* at 411, 96 S.Ct. at 1581. The Court recognized, however, that the act of producing the documents in certain circumstances may be testimonial to the extent that the act of production concedes "the existence of the papers demanded and their possession or control by the taxpayer," or because the production serves to authenticate the materials in question. *Fisher*, 425 U.S. at 410, 96 S.Ct. at 1581.

Eight years later, the Court applied the *Fisher* analysis in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), when a sole proprietor invoked a Fifth Amendment privilege to resist production of subpoenaed business records. In *Doe*, the Court explained and followed its earlier analysis in *Fisher* by specifically indicating that the contents of the subpoenaed records were not privileged, and that the sole proprietor's act of producing the subpoenaed records was the only testimoni-al communication compelled by the subpoena. *Id.* at 612, 104 S.Ct. at 1242. ("Where the preparation of business records is voluntary, no compulsion is present. A subpoena that demands production of documents 'does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought.' ") *Id.* at 610–11, 104 S.Ct. at 1241 (citing *Fisher*, 425 U.S. at 409, 96 S.Ct. at 1580) (footnote omitted).

Although these cases concerned the subpoena of business records, the Court's recent and apparent abandonment of the traditional Fifth Amendment inquiry into the nature of the contents of documents, *see e.g., Bellis v. United States*, 417 U.S. 85, 87–95, 94 S.Ct. 2179, 2182–87, 40 L.Ed.2d 678 (1974) (containing history of Court's practice of distinguishing between business and private papers and status of their possession), as well as some dicta in the opinions calls into question Boyd's continued protection for private papers.[4]

In 1988, the First Circuit, recognizing this question to be an open question of law, surveyed the Circuits' diverging opinions regarding Justice O'Connor's conclusion

---

*Andresen,* the Court cited with approval *United States v. White,* 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944) ("[t]he constitutional privilege against self-incrimination ... is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him."). *Andresen,* 427 U.S. at 475, 96 S.Ct. at 2745.

**4.** For example, in footnote ten of *Doe* the Court stated "[i]f the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged." *Doe,* 465 U.S. at 612, 104 S.Ct. at 1242. In a concurring opinion, Justice O'Connor concluded that the opinion "sounded the death knell of *Boyd,*" 465 U.S. at 618, 104 S.Ct. at 1245 (O'Connor, J., concurring). However, Justice Marshall, with whom Justice Brennan joined, stated in part:

"Contrary to what Justice O'Connor contends [citation omitted], I do not view the Court's opinion in this case as having reconsidered whether the Fifth Amendment provides protection for the contents of "private papers of any kind." This case presented nothing remotely close to the question that Justice O'Connor eagerly poses and answers. First.... Second, the documents at stake here are business records which implicate a lesser degree of concern for privacy interest than, for example, personal diaries.
"Were it true that the Court's opinion stands for the proposition that "the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind," [quoting Justice O'Connor] I would assuredly dissent. I continue to believe that under the Fifth Amendment 'There are certain documents no person ought to be compelled to produce at the government's request'."
*Id.* at 619, 104 S.Ct. at 1246, (Marshall, J., dissenting) (quoting *Fisher,* 425 U.S. at 431–32, 96 S.Ct. at 1590–91). *See also Baltimore City Dep't of Social Serv. v. Bouknight,* 493 U.S. ——, 110 S.Ct. 900, 905, 107 L.Ed.2d 992 (1990) (Justice O'Connor writing for the majority in a case requiring the production of Bouknight's child, broadly stated that "a person may not claim the Amendment's protections based upon the incrimination that may result from the contents or nature of the thing demanded" (citing *Doe,* 465 U.S. at 612 n. 10, 104 S.Ct. at 1242 n. 10 and her concurring opinion in *Doe* )).

that *Fisher* and *Doe* implicitly had overruled Boyd's protection for private papers.[5] *See In re Steinberg,* 837 F.2d 527, 529–30 & nn. 3–4 (1st Cir.1988). Consistent with Justice O'Connor's reasoning, the Ninth Circuit has held that if the creation of the documents subpoenaed was not compelled, the contents of the documents are not protected by the Fifth Amendment, irrespective of the characterization of those documents. *In Re Grand Jury Proceedings on February 4, 1982,* 759 F.2d 1418, 1419 (9th Cir.1985). *See also In Re Sealed Case,* 877 F.2d 83, 84 (D.C.Cir.1989) (in dicta, contents of voluntarily prepared personal records not covered by privilege); *United States v. Clark,* 847 F.2d 1467, 1468 (10th Cir.1988) (contents of voluntarily prepared tax records not contested); *In Re Kave,* 760 F.2d 343, 355 (1st Cir.1985) (rejecting content-based Fifth Amendment analysis).

In *United States v. (Under Seal),* 745 F.2d 834 (4th Cir.1984), *vacated as moot,* 471 U.S. 1001, 105 S.Ct. 1861, 85 L.Ed.2d 155 (1985), however, the Court of Appeals for the Fourth Circuit has held that despite the dicta of the Supreme Court opinions with respect to the vitality of *Boyd's* protection of private documents, "none of these decisions has overruled *Boyd*" and

"no later decision of the Supreme Court has held to the contrary [that the Fifth Amendment privilege no longer protects an individual from producing private papers]." Id. at 839. *See also United States v. Lehman,* 887 F.2d 1328, 1336 (7th Cir.1989) (implying in dicta distinction between private documents and bank records); *United States v. Katin,* 109 F.R.D. 406, 406 (D.Mass.1986) (acknowledging open question of law, citing the Fourth Circuit, and holding that Fifth Amendment protects compelled production of personal papers such as photographs, diaries, and personal correspondence).

The Second Circuit has followed the *Fisher–Doe* analysis in *In Re Proceedings before August 6, 1984 Grand Jury,* 767 F.2d 39, 41 (2d Cir.1985) and affirmed the district court's order directing the witness to produce a tape recording, found to be a business record [6], that the defendant had made of conversations between himself and others pursuant to an act-of production immunity order. *Id.* at 41. The Court of Appeals, however, expressly stated that the question of whether the Fifth Amendment protects the contents of private non-business papers had been left open in *Fisher* and remained open in this Circuit.[7] Ac-

**5.** The First Circuit did not reach the issue. *See In re Steinberg,* 837 F.2d at 530. Similarly, both the Sixth and Eighth Circuits have noted that the question remains open. *See Butcher v. Bailey,* 753 F.2d 465, 469 (6th Cir.1985) *cert. dismissed,* 473 U.S. 925, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985); *United States v. Mason,* 869 F.2d 414, 416 (8th Cir.1989).

**6.** The Second Circuit noted that the tapes contained conversations pertaining "primarily to business matters" and that "since the witness' communications were disclosed to several persons (also recorded on the tape), they necessarily do not touch on the more intimate aspects of [Doe's] life. Under these circumstances, the Court finds that these subpoenaed materials are not what some members of the Supreme Court had in mind in suggesting that the contents of some intimate documents may still enjoy Fifth Amendment protection." Id. at 41.

**7.** In 1988, when discussing the duty of a principal of a corporation to relinquish a business tape, the Circuit implied that there still existed a distinction between the availability of the Fifth Amendment privilege that turned on the contents of the documents sought. In *In re Three*

*Grand Jury Subpoenas,* 847 F.2d 1024 (2d Cir. 1988) the court stated:

No doubt the contents of the tape, which Roe was properly ordered to produce for *in camera* inspection, will assist the district judge in determining whether the tape is property of Roe or the entities, but the duty to produce the tape, even for this limited purpose, may not be imposed on the entities until the judge has determined, at least preliminarily, that it is their property. Were this not the case, the government could obtain *any personal document* of any principal of a corporation or partnership merely by subpoenaing it from the business entity, upon penalty of contempt. *Principals of such entities would thereby lose the Fifth Amendment privilege.*

Id. at 1030 (emphasis added). Although this language would imply that this Circuit recognizes a continued distinction with respect to the protection of personal as opposed to business documents, the language in the opinion merely may have referred to a Fifth Amendment privilege with respect to the act of producing the document, as opposed to a privilege asserted with respect to the contents of the document.

In a post-*Fisher,* pre-*Doe* case, Judge Owen held that where a subpoena commanded the

cordingly, to the extent the documents subpoenaed are non-business records, movant's motion to quash presents an open question of law.

### B. Boyd Remains the Law

In *Boyd*, the Boyds contested a government order directing the Boyds to produce an invoice allegedly containing proof that the Boyds were guilty of tax evasion and the Supreme Court found that the statute pursuant to which the order was issued violated the Fifth Amendment privilege against self-incrimination. *Boyd*, 116 U.S. at 633, 6 S.Ct. at 533. Justice Bradley, writing for the seven-justice majority, stated that there exists an "intimate relation" between the Fourth and Fifth Amendments creating a zone of privacy encompassing an individual's person and property such that the seizure of the documents in question was "unreasonable" within the meaning of the Fourth Amendment and that the Fifth Amendment prohibited the admission of evidence seized in violation of the Fourth Amendment prohibition against unreasonable seizures. *Id.* Indeed, Justice Bradley concluded that the search for "mere evidence" constituted compelled self-incrimination in that "we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." [8] *Id.* at 633, 6 S.Ct. at 534.

The *Boyd* opinion rested heavily on the English case *Entick v. Carrington*, 19 How.St.Tr. 1029 (C.P.1765), in which Lord Camden invalidated a "paper-search" as a trespass at common law when conducted against the party with a superior property right. Lord Camden found that a search of an individual's allegedly seditious private papers was tantamount to compelling the individual to testify against himself and that the search was offensive in that "[p]apers are the owners goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection...." *Id.* 19 How.St.Tr. at 1066. Justice Bradley in *Boyd* stated that:

> The principles laid down in [*Entick*] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the party of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; *but any forcible and compulsory extortion of a man's own testimony or his private papers to be used as evidence to convict him of a crime or to forfeit his goods, is within the condemnation of that judgment.* In this regard the Fourth and Fifth Amendments run almost into each other.

116 U.S. at 630, 6 S.Ct. at 532 (emphasis added).[9]

1980) (whether *Boyd* still protects "non-business, intimate personal papers such as private diaries or drafts of letters or essays is an open question").

**8.** "[Compulsory production of incriminating books and papers] is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American." *Boyd*, 116 U.S. at 632, 6 S.Ct. at 533.

**9.** The "private papers" in *Boyd* was a business invoice regarding a shipment of glass while the papers in *Entick* were seditious documents. Thus, the notion of privacy announced in *Boyd* did not reflect the importance of the contents of the writings but was inextricably woven in the law of property and that the owner Boyd had greater title to his *private property*. Indeed, thirty-five years later in *Gouled*, Justice Clarke, writing for the Court stated that "there is no

production of personal diaries a defendant could assert a privilege against self-incrimination and has no obligation to respond to the subpoena except to indicate that he has no corporate diaries. *In Re Grand Jury Proceedings*, 506 F.Supp. 395, 396 & n. (S.D.N.Y.1981) (citing *Boyd* as still controlling). *See also United States v. Schlansky*, 709 F.2d 1079, 1083 (6th Cir.1983) (*Boyd* may still protect private diary), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); *In Re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1042–44 (3rd Cir.1980) (staunchly defending the vitality of *Boyd*, the history of the right against self-incrimination and holding that *Fisher* "in no way contradicts the proposition to which we today adhere: that the Fifth Amendment protects an accused from government-compelled disclosure of self-incriminating private papers, such as purely personal date books"); *In Re Grand Jury Proceedings (Martinez)*, 626 F.2d 1051, 1054 n. 2 (1st Cir.

*Boyd*, as the first significant Court case [10] on the meaning of both the Fourth [11] and Fifth Amendments, has been woven into constitutional case law throughout the twentieth century and Fifth Amendment analysis for the production of documents as recently as 1988, inevitably begins with *Boyd. See Braswell v. United States*, 487 U.S. 99, 105, 108 S.Ct. 2284, 2288, 101 L.Ed.2d 98 (1988). *Boyd*, however, announced an expansive view of the Fourth and Fifth Amendments that soon caused analytical problems.[12] Over the last century, the construction of both Amendments has gone from *Boyd*'s broad view that an accused could not be forced to help his accuser in any way to the narrow construc-

tion of both Amendments now voiced by the Court.

Commensurate with the advance of technological ability and the increased need to detect more sophisticated forms of crime,[13] the Court has altered the principle that the accused should not provide the evidence that may self-incriminate and, accordingly, has strained to carve exceptions out of the analysis in *Boyd.* In addition to the over-ruling of the Fourth Amendment aspects of the opinion, over the century, the Court has chipped away from *Boyd*'s protection two other large blocks of formerly unobtainable self-incriminating evidence—"nontestimonial" evidence [14] and business records.[15]

special sanctity in papers" and thereby reasoned that any type of personal property could not be seized because that would render the accused as the "unwilling source of the evidence" used to incriminate. 255 U.S. at 306, 309, 41 S.Ct. at 263, 265.

**10.** The Supreme Court has referred recently to *Boyd's* holding as a "rule [the prohibition against forcing the production of private papers] searching for a rationale consistent with the proscription of the Fifth Amendment against compelling a person to give 'testimony' that incriminates him." *Fisher*, 425 U.S. at 409, 96 S.Ct. at 1580, notwithstanding that *Boyd* has been hailed as one of the "greatest constitutional decisions" *Schmerber v. California*, 384 U.S. 757, 776, 86 S.Ct. 1826, 1838, 16 L.Ed.2d 908 (1966) (Black, J., dissenting) of the Court, and "a case that will be remembered as long as civil liberty lives in the United States" *Olmstead v. United States*, 277 U.S. 438, 474, 48 S.Ct. 564, 571, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967).

**11.** The Supreme Court has held that a subpoena *duces tecum* issued to obtain business records is not subject to more stringent Fourth Amendment standards. *United States v. Miller*, 425 U.S. 435, 446 n. 8, 96 S.Ct. 1619, 1625 n. 8, 48 L.Ed.2d 71 (1976). *See also Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946) (no probable cause requirement for subpoenaing documents) and movant has not made a Fourth Amendment challenge to seek a higher standard for the subpoena of the personal records.

**12.** *See, e.g.*, Alito, *Documents and the Privilege Against Self-Incrimination*, 484 U.Pitt.L.Rev. 27, 37 (court later required to later label a subpoena a "constructive search" to avoid subjecting the subpoena to Fourth Amendment probable cause and warrant requirements and immunity for Fifth Amendment not held to diminish Fourth Amendment protection).

**13.** *See e.g.*, Geyh, *The Testimonial Component of the Right Against Self-Incrimination*, 36 Cath.U. L.Rev. 611, 626 ("The emergence and eventual

acceptance of the testimonial requirement closely parallels advances in forensic science, developed in response to the changing character of criminal conduct....").

**14.** Although once protected, *see* Geyh, *The Testimonial Component of the Right Against Self-Incrimination*, 36 Cath.U.L.Rev. 611, 621 nn. 46–49 (citing state cases around the turn of the century prohibiting compelled testimony such as forced making of footprints and submission to physical examination or identification), the compelled transfer of physical evidence or "sufficiently nontestimonial" evidence from the accused to the accuser has been excepted from fifth amendment protection insofar as such communications do not implicate the accused's "testimonial capacities." *Schmerber v. California*, 384 U.S. 757, 763–65, 86 S.Ct. 1826, 1831–33, 16 L.Ed.2d 908 (1966) (distinguishing *Boyd* by noting that "testimonial" evidence must reveal the contents of one's mind and therefore "the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, *for example, compliance with a subpoena to produce one's papers*") (emphasis added)). Accordingly, since *Boyd*, the Fifth Amendment has been read to permit the accused to participate in a line up, *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967), to speak to obtain voice exemplars, *Id.* to write for handwriting analyses, *Gilbert v. California*, 388 U.S. 263, 265–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967), to don clothing for identification purposes, *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), to furnish name and address, *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) to give blood, *Schmerber v. California*, 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1831–32, 16 L.Ed.2d 908 (1966) fingerprints, *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and most recently, to permit the admission of a videotape of the accused's sobriety testing performance. *Pennsylvania v. Muniz*, — U.S. —, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

With respect to business records, the *Bellis* Court demonstrated how the Fifth Amendment privilege forced courts into a hairsplitting analysis of the character and size of the business organization and the status of the person having access to those documents. *United States v. Bellis*, 417 U.S. at 88–95, 94 S.Ct. at 2183–87. *Fisher* and *Doe*, however, pronounced a new approach to the application of the Fifth Amendment to business records that allows courts to avoid the inquiries formerly required. *See e.g.*, Note, *The Fifth Amendment Privilege For Producing Corporate Documents*, 84 Mich.L.Rev. 1544, 1563 ("*Fisher* and *Doe* rendered privacy and ownership irrelevant to analysis of self-incrimination claims."). In so doing, the Court narrowed the spectrum of interpretation of the purpose and meaning of the Fifth Amendment from the meaning of self-incrimination as being the source of evidence in *Boyd* and *Gouled*, to the *Fisher–Doe* test of whether the person subpoenaed is compelled to give testimonial evidence that incriminates or to self-incriminate through the admission of the existence of, the authentification of, or the identification of the documents subpoenaed.

This narrowing of the former, firmly held vision of the Fifth Amendment and a straightforward application of the *Fisher–Doe* analysis according to the government compels a contents-blind approach to the Fifth Amendment. *See, e.g.*, Bradley, *Constitutional Protection for Private Papers*, 16 Harv.C.R.C.L.L.Rev. 461, 475 (1981) ("Despite the reservations expressed in *Fisher* and *Andresen*, the thrust of those opinions is that diaries, datebooks, letters, and other papers of the most private nature are not protected anymore than were

Andresen's business records."). The Court in *Doe* did not reserve the business/personal contents [16] dichotomy as it did in *Fisher*, and the *Doe* reasoning appears to apply with equal force to all preexisting voluntarily prepared documents. Comment, *The Right Against Self-Incrimination by Producing Documents: Rethinking the Representative Capacity Doctrine*, 80 Nw.L. Rev. 1605, 1619 n. 123 (1986). Coupled with footnote ten, according to the government, the Court has laid the groundwork for a contents-blind analysis and has appeared to all but bring itself to overrule the vestiges of *Boyd's* Fifth Amendment protection for the contents of private papers. *See also Bouknight*, 493 U.S. at ——, 110 S.Ct. at 905 (broad characterization of the *Doe* holding in dicta promotes a contents-blind analysis); *see also* Note, *The Life and Times of* Boyd v. United States *(1986–1976)*, 76 Mich.L.Rev. 184, 212 ("*Boyd* is dead. But the Court refuses to take the final step of overruling it.").

If the *Fisher–Doe* definition of compelled self-incrimination is limited to apply only to documents not voluntarily produced or utterances forcibly extracted, then the contents of movant's personal diaries, private non-business tape recordings, appointment books, and myriad personal papers, voluntarily created at one time, to the extent that movant already has admitted their existence and his possession of such documents, would not be protected by the Fifth Amendment. However, a mechanical application of the *Fisher–Doe* analysis to bar the invocation of the Fifth Amendment for private papers is inappropriate.

The Court's own reluctance to overrule *Boyd* explicitly, to narrow consistently its

**15.** Since *Wilson v. United States*, 221 U.S. 361, 377, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911), officers of corporations could not claim the privilege to refuse to produce corporate books. The privilege also has been denied for business records for previously dissolved corporations *Wheeler v. United States*, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913), even when in the possession of an individual who had been the corporation's sole shareholder, *Grant v. United States*, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913), as well as to an officer of an unincorporated association, a labor union, *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). Similarly, the Court in *Bellis*, denied the privilege for a three-person partnership's financial records when the petitioner was holding the subpoenaed records in a representative capacity. *Bellis*, 417 U.S. at 101, 94 S.Ct. at 2189. Throughout these cases, the emphasis has

been on "the organizational character of the records and the representative aspect of [the subpoenaed person's] possession". *Bellis*, 417 U.S. at 99, 94 S.Ct. at 2188. Indeed, in *Bellis*, merely two years prior to *Fisher*, the Court stated that the business record cases "reflect the Court's consistent view that the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only a natural individual from compulsory incrimination through his own testimony *or personal records.*'" *Bellis*, 417 U.S. at 89–90, 94 S.Ct. at 2183–84 (quoting *White*, 322 U.S. at 701, 64 S.Ct. at 1252 (emphasis added)).

**16.** Indeed, the *Doe* Court instead indicated that the documents summonsed in *Fisher* related to the personal tax liability of the claimant and thus were arguably much more personal than the business documents considered in *Doe*. *See Doe*, 465 U.S. at 610 n. 7, 104 S.Ct. at 1241 n. 7.

discussion to the topic of "business records," *see Bradley, Constitutional Protection for Private Papers*, 16 Harv.C.R.C. L.L.Rev. 461, 473 n. 58 (1981–82); *Braswell v. United States*, 487 U.S. 99, 102, 108 S.Ct. 2284, 2286, 101 L.Ed.2d 98 (1988) ("There is no question but that the contents of the subpoenaed *business records* are not privileged." (emphasis added)), and to reserve the issue of private papers, can be read to portend a willingness to preserve *Boyd* 's protection of private papers. Similarly, the Court's refusal to apply the *Fisher–Doe* analysis in *Braswell* may be indicative that the *Fisher–Doe* analysis is not necessarily an overarching theory to the scope of the entire Fifth Amendment. *See Braswell*, 487 U.S. at 109, 108 S.Ct. at 2290–91 ("To be sure, the holding in *Fisher* —later reaffirmed in *Doe* —embarked upon a new course of Fifth Amendment analysis.... We cannot agree, however, that it rendered the collective entity rule obsolete.")[17] *See also The Supreme Court, 1987 Term—Leading Cases* 102 Harv.L. Rev. 170, 177 (1988) (the *Braswell* Court relied indirectly upon an analysis based on the compelled disclosure of private documents); *Doe v. United States*, ("*Doe II* "), 487 U.S. 201, 209, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988) ("[T]he Court in *Fisher* and *Doe* did not purport to announce a universal test for determining the scope of the privilege ..."). Furthermore, in addition to the Fourth Circuit's contention that *Boyd* is controlling still, *see United States v. (Under Seal)*, 745 F.2d at 839, the opinions stating that the question is open support a reading of *Fisher–Doe* that does not eliminate automatically the contents-based approach for retaining the privilege with respect to private documents.

*Boyd* 's holding with respect to private papers should be preserved, because the underpinning for the protection against the use of private papers to incriminate is more than a relic of a property-laden construction of the Fourth and Fifth Amendments and the now discarded legal analysis of the intimate relation between them. *Boyd* contains a "kernel of truth" and an appealing, defensible analytical proposition that the compelled production of one's personal papers is testimonial to the extent that those papers are no more than an extension of one's thoughts. *See, Documents and the Privilege Against Self–Incrimination*, 48 U.Pitt.L.Rev. 27, 39 (1986) (*Boyd* has endured "because its reasoning contained a kernel of truth ... forcing an individual to give up possession of these intimate writings may be psychologically comparable to prying words from his lips.") Bradley, *Constitutional Protection For Private Papers*, 16 Harv.C.R.C.L.L.Rev. 461, 480– 81 (1981–82) (the most private papers are the *"sanctum sanctorum"* of the personality). Indeed, such papers and statements are statements of the witness and thus among the most powerful forms of proof in the law.

Implicit in *Boyd* are the corollary realities that one's papers can be an extension of oneself and may exist to some extent because of the limitations of one's faculties—the ability to remember and the need or desire to write down thoughts to clearly formulate and to record them for future use. If all minds could recall perfectly a month's worth of lunch appointments, remember what was said in Father's Day cards of yesteryear, or draft cogently a letter on first attempt, there would be little need to write but for the desire to share these mental processes with others or to see the satisfaction of words on paper. *See* Bradley, *Constitutional Protection For Private papers*, 16 Harv.C.R.C.L.L. Rev. 461, 494 ("[G]iven the limitations of the human brain, many thoughts, often fleeting and impermanent, are of little importance unless they are recorded.... Just as mental input is protected in *Stanley* [*v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)], so should mental output be protected.").

As Justice Brennan stated in *Fisher:*

I perceive no principle which does not permit compelling one to disclose the contents of one's mind but does permit compelling the disclosure of the contents of that scrap of paper by compelling its production. Under a contrary view, the constitutional protection would turn on fortuity, and persons would, at their peril, record their thoughts and the events of their lives. The ability to think private thoughts, facilitated as it is by pen and paper, and the ability to preserve intimate memories would be curtailed

---

**17.** The dissent in the same case can also be read to support the retention of the privilege for private documents to the extent that it recognizes that one of "the critical foundations of the constitutional guarantee against self-incrimina-tion .. is an explicit right of a natural person, protecting the realm of human thought and expression...." *Braswell*, 487 U.S. at 119, 108 S.Ct. at 2296 (Kennedy, J., dissenting).

through fear that those thoughts or the events of those memories would become the subjects of criminal sanctions however invalidly imposed.

*Fisher*, 425 U.S. at 420, 96 S.Ct. at 1585–86 (Brennan, J., concurring).

To the extent that ones private papers reveal the contents of one's mind, there is no defensible line to be drawn between extracting a confession from one's lips and doing the same by subpoenaing the thoughts one recorded in one's diary this morning. *See Boyd*, 116 U.S. at 633, 6 S.Ct. at 533. Coerced communications are undesirable insofar as they are unreliable, but then if the Fifth Amendment were to protect only against State-extracted confessions there is no reason the Due Process Clause of the Fifth or Fourteenth Amendments, or even the Eighth Amendment could not protect against a Star–Chamber method of law enforcement.[18] On the contrary, a reading of the Fifth Amendment as concerned only with these aspects of compulsion is underinclusive [19] and is not the measure of a system of justice premised on an accusatorial as opposed to an inquisitorial system. *See,* Gerstein, *The Demise of Boyd: Self–Incrimination and Private Papers in the Burger Court,* 27 U.C.L.A. L.Rev. 343, 395 (1979). If the Fifth Amendment is to stand for our constitutional preference for an accusatorial system, it must protect the divulgence of the contents of one's mind, one's thought pro-

cesses, when those testimonial divulgences—be they oral or written communications—would self-incriminate. *See Pennsylvania v. Muniz*, —— U.S. ——, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *Doe II*, 487 U.S. at 213, 108 S.Ct. at 2349, " '[t]hese policies [the purposes of the privilege] are served when the privilege is asserted to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating to him to the offense *or from having to share his thoughts and beliefs with the Government*' ") (emphasis added) (footnote omitted); *Braswell*, 487 U.S. at 119, 108 S.Ct. at 2296 (Fifth Amendment protects realm of human thought and expression) (Kennedy, J., dissenting); *Schmerber*, 384 U.S. at 765, 86 S.Ct. at 1832 (testimonial implies "some communicative act or writing").

## The Balance of Interests Compels Protection

If the Fifth Amendment is not read to protect against the subpoena of private papers, then, to the degree that Fifth Amendment analysis permits the balancing of interests to arrive at the extent to which a person must participate in their own incrimination, the interests of privacy, the desire to preserve the autonomous functioning of the individual, and practical considerations outweigh the need for incriminating evidence and support the retention of the privilege for private papers.[20]

18. Before the Fifth Amendment was applied to the states in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Supreme Court routinely applied the Fourteenth Amendment's due process clause to invalidate convictions based on confessions obtained by objectionable practices. *See e.g., Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).

19. Not only would a reading of *Fisher–Doe* be underinclusive if it fails to protect divulgence of the contents of one's mind to self-incriminate, it is also overinclusive to the extent that the Court's emphasis on compulsion would permit all voluntarily created testimonial communications. For example, should lie detector and computer technology advance to permit an analysis of brainwave function and physiological effects to reflect thought, a machine might be developed to read the mind. *See* Schnapper, *Unreasonable Searchers and Seizures of Papers,* 71 Va.L.Rev. 869, 927 (1985). Under a strict reading of *Fisher–Doe,* one could be given act-of-production immunity for subjecting oneself to the mind-reading machine. Nonetheless, be-

cause the existence of one's thoughts, one's cognitive process, is a "foregone conclusion," the contents of any thoughts one voluntarily creates could be used against one in a criminal proceeding under the *Fisher–Doe* analysis.

20. Although this retention of the privilege for private documents continues the private-personal inquiry and thus imposes upon courts the burden of determining the characterization of documents, the burden is no more than what has existed since *Boyd,* not without parameters, *see e.g.* McKenna, *the Constitutional Protection of Private Papers: the Role of Hierarchical Fourth Amendment,* 53 Indiana L.Rev. 54, 54 n. 1 (1977–1978) (citing cases and commentaries defining the scope); *United States v. Fisher,* 425 U.S. at 426–28, 96 S.Ct. at 1588–89 (Brennan, J., concurring) (classifying certain documents as privileged), and certainly no greater a task than the business record exceptions already had imposed on the courts. *See e.g., Mosteller, Simplifying Subpoena Law: Taking the Fifth Amendment Seriously,* 73 V.A.L.Rev. 1, 1 (1987) (courts required to consider whether paper on which document written purchased by business that employs its author, whether its contents pertain to business or personal matters, whether that

Although the Fifth Amendment is worded absolutely, like the similarly absolute First Amendment, the privilege against compelled self-incrimination has been subject to both explicit and implicit balancing analyses weighing the need for tools to procure evidence for law enforcement and the interests of those invoking the privilege against self-incrimination. Arenella, *Schmerber and the Privilege Against Self-Incrimination*, 20 Am.Cr.L.Rev. 31, 38 (1982). *See also* Note, *The Supreme Court, 1987 Term: Leading Cases I.A. Constitutional Law: Criminal Law and Procedure, 4. Right Against Self-Incrimination—Product of Documents.*, 102 Harv.L.Rev. 170, 173 (1988) ("To augment the doctrinal justification, the [*Braswell*] Court appealed to policy considerations.... The prosecution of white collar crime ... would be hampered by allowing custodians [of documents] to invoke the fifth amendment, and thereby to shroud evidence of wrongdoing."); *California v. Byers*, 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9 (1971) ("Tension between the State's demand for disclosures and the protection of the right against self-incrimination ... must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protection on the others."); *Id.* at 434, 91 S.Ct. at 1541 (Harlan, J., concurring) (scope of the privilege will vary depending upon the contexts and interests at stake); *United States v. Holt*, 218 U.S. at 252–53, 31 S.Ct.

at 6 (Fifth Amendment does not shield physical evidence when need is material); Geyh, *The Testimonial Component of the Right Against Self-Incrimination*, 36 Cath.U.L.Rev. 611, 619 n. 35 (1987) ("in context of fifth amendment, the testimonial requirement may be viewed as the product of a categorical balancing of interests ... between the values the right was intended to protect and the practical need for effective crime control").

■ Accordingly, the government's interest in securing evidence for law enforcement, although compelling, is not absolute, *see Weeks v. United States*, 232 U.S. 383, 397, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914) and must be balanced against the court's recognition of the Fifth Amendment's protection for individual privacy.[21]

Although the *Fisher* Court limited privacy considerations to the extent that it could not "cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy"[22] the Court just two years earlier in *Bellis* stated that " "[p]rotection of individual privacy was the major theme running through the court's decision in *Boyd*" *Bellis*, 417 U.S. at 91, 94 S.Ct. at 2184. *See also Couch*, 409 U.S. 322, 327, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1973) ("the privilege ... respects a private inner sanctum of individual feeling and thought...."). Indeed, in surveying the goals of the Fifth

business, regardless of size, is organized as corporation or sole proprietorship, whether partnership made of individuals related by blood or marriage or unrelated, and whether it is organized for a single venture or for general purposes).

**21.** The zone of privacy technically does not stem from *Boyd, see* Note, *The Life and Times of Boyd v. United States (1886–1976)*, 76 Mich.L Rev. 184, 193–95 (1977) (Justice Brandeis' dissent in *Olmstead* marked the beginning of the shift from the Fourth Amendment emphasis on property to privacy), but subsequent cases relying upon *Boyd* have imputed a "zone of privacy" into the Fifth Amendment that now encompasses a nascent notion of individual and inviolate privacy. *See e.g., Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); *Time, Inc. v. Hill*, 385 U.S. 374, 413, 87 S.Ct. 534, 555, 17 L.Ed.2d 456 (1967) (Fortas, J., dissenting); *Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965); *Frank v. Maryland*, 359 U.S. 360, 363, 79 S.Ct. 804, 807, 3 L.Ed.2d 877 (1959), *overruled by Camera v. Municipal Court of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18

L.Ed.2d 930 (1967); *Feldman v. United States*, 322 U.S. 487, 489–90, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408 (1944), *overruled by Murphy v. Waterfront Comm'n*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *Goldman v. United States*, 316 U.S. 129, 137, 62 S.Ct. 993, 997, 86 L.Ed. 1322 (1942) (Murphy, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Olmstead v. United States*, 277 U.S. 438, 475–76, 48 S.Ct. 564, 571–72, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). The scope if not plausibility of a zone of privacy in the Fifth Amendment has been limited, however, by the upholding of the constitutionality of immunity statutes, the lack of availability of the privilege absent the hazard of any incrimination, and the lack of privilege for nontestimonial or physical evidence. *See, e.g.,* Note, *Formalism*, 90 Harv.L.Rev. at 975; Comment, *The Right Against Self-Incrimination by Producing Documents: Rethinking the Representative Capacity Doctrine*, 80 Nw.U.L.Rev. 1605, 1636 (1986).

**22.** In *Fisher*, the Court acknowledged that "the Court has often stated that one of the several purposes served by the constitutional privilege

Amendment, Justice Goldberg stated that the privilege:

> reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspect of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhuman treatment and abuses; our sense of fair play ...; *our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"* ...; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) (citations omitted) (emphasis added); *see also Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965) ("These three amendments [the first, fourth, fifth] are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well.'" (citing *Frank v. Maryland,* 359 U.S. 360, 376, 79 S.Ct. 804, 814, 3 L.Ed.2d 877 (Douglas, J., dissenting) (citations omitted)).

Consequently, even if a zone of privacy is not imputed into the Fifth Amendment, the

against compelled testimonial self-incrimination is that of protecting personal privacy." *Fisher,* 425 U.S. at 399, 96 S.Ct. at 1575 (citing as examples, *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964); *Couch v. United States,* 409 U.S. 322, 332, 335–336, 93 S.Ct. 611, 618, 619–20, 34 L.Ed.2d 548; *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966); *Davis v. United States,* 328 U.S. 582, 587, 66 S.Ct. 1256, 1258, 90 L.Ed. 1453 (1946)). But the Court warned that it "has never suggested that every invasion of privacy violates the privilege. Within the limits imposed by the language of the Fifth Amendment, which we necessarily observe, the privilege truly serves privacy interests; but the Court has never on any ground, personal privacy included, applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which, in the court's view, did not involve compelled testimonial incrimination of some sort." *Id.* (footnote omitted). *See also In re Horowitz,* 482 F.2d 72, 85 (2d Cir.1973) ("[N]o Supreme Court deci-

fundamental right to privacy can certainly be said to buttress an exemption for personal communications. *See, e.g., Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) (fundamental right to privacy provided an "added dimension" for finding that First Amendment right to receive information protected rights of an individual to read "obscene matter"); Note, *Formalism,* 90 Harv.L. Rev. at 987 & n. 251 ("Unless the fourth and fifth amendments can be read as putting a premium on the value of personal privacy in the face of government encroachment, it is difficult to imagine what these amendments can mean.").

Moreover, in consideration of the extent to which an individual should be made to produce documents the contents of which are personal and self-incriminating, not only privacy, but concerns of moral autonomy are present. Gerstein, *The Demise of Boyd: Self–Incrimination and Private Papers in the Burger Court,* 27 U.C.L.A. L.Rev. at 396 (1979) (privilege "is part of the overall structure of rights which is directed precisely at maintaining a private life, and thereby individual freedom, possible."). Not only is a dimension of one's character forfeited [23] but one's "autonomy is attacked at its source when the government purports to control, not only particular actions, but the process of reflection by which we work out the values underlying our decisions to act." Gerstein, *The Demise of Boyd: Self–Incrimination and Private Papers in the Burger Court,* 27 U.C.L.A.L.Rev. at 390.

sion has upheld a Fifth Amendment claim predicated solely, or even primarily, on the basis of an invasion of privacy...."), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

**23.** *See also* Gavison, *Privacy and the Limits of the Law,* 89 Yale L.J. 421, 443 (1980) (footnote omitted):

> Some human activities only make sense if there is some privacy. Plots and intrigues may disappear, but with them would go our private diaries, intimate confessions, and surprises. We would probably try hard to suppress our daydreams and fantasies once others had access to them. We would try to erase from our minds everything we would not be willing to publish, and we would try not to do anything that would make us likely to be feared, ridiculed, or harmed. There is a terrible flatness in the person who could succeed in these attempts. We do not choose against total lack of privacy only because we cannot attain it, but because its price seems much too high.

Finally, in addition to privacy and moral autonomy, practical reasons, when addressed in the balancing analysis, also militate toward the retention of the privilege for private documents. First, unlike business records, there will be few instances where the government knows for certain of the existence of the private records and even fewer instances where the nonproduction of records, as in regulated and thereby required business records, is in itself incriminating. Consequently, unless the government can prove that an individual actually has the documents requested, the individual may invoke the Fifth merely by denying the existence or possession of the documents. *See* Alito, *Documents and the Privilege Against Self–Incrimination,* 48 U.Pitt.L.Rev. 27, 471–81 & n. 239 ("Precisely because such records are private, their existence is seoldom [sic] known to law enforcement authorities. Even if the authorities suspect or have some evidence that such documents may exist, unless there is substantial proof of the documents' existence, the witness possessing the records will be able to disobey the subpoena with substantial impunity."); Cf. *Doe,* 465 U.S. at 614 n. 13, 104 S.Ct. at 1243 n. 13.

Second, if act of production immunity is construed to immunize the contents insofar as production attests to existence, and the contents are the fruits of the existence, *see Fisher,* 425 U.S. at 434, 96 S.Ct. at 1592 (Marshall, J., concurring) (grant of immunity with respect to testimonial act of admitting existence will effectively shield contents); *but see* Alito, *Documents and the Privilege Against Self–Incrimination,* 48 U.Pitt.L.Rev. 27, 60 (argument clearly wrong to extent non-immunized source will exist and contents themselves equal non-immunized evidence of their own existence), prosecution may prove difficult if not impossible in that the government will be required to show an independent source of all information contained within the documents. *See Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972).

Finally, because broad subpoena power is subject to relevance and scope require-ments rather than Fourth Amendment limitations, absent Fifth Amendment protection, subpoenas for private documents can be used as an end run around probable cause and warrant requirements. *See* McKenna, *The Constitutional Protection of Private Papers: The Role of A Hierarchical Fourth Amendment,* 53 Ind.L.J. 55, 90 (1977–1978) (heightened showing for subpoena of private papers may be necessary to prevent circumvention of warrant clause requirements); *cf. United States v. (Under Seal),* 745 F.2d 834, 839 n. 11 (4th Cir.1984) (discussing *United States v. Dionisio,* 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1972) and contending that one reason subpoenas are not subject to more strenuous Fourth Amendment constraints is precisely because Supreme Court has recognized that other constitutional limitations, including Fifth Amendment's protection against production of private books and records protect against broad subpoena power).[24]

*Conclusion*

The history and purpose of the Fifth Amendment, the Supreme Court's repeated attempts to preserve the sanctity of private papers, the recognition that one's personal documents are no more than an extension of one's thought processes, the fundamental right of privacy, as well as practical considerations, all militate toward preventing an application of *Fisher–Doe* to personal documents and quashing the government's subpoena for those possessed by the movant.

Accordingly, movant's motion to quash is granted to the extent that the subpoenaed materials are personal "non-business" records and movant is ordered to produce the subpoenaed materials for *in camera* inspection.

It is so ordered.

## MEMORANDUM OPINION

### On Motion To Modify or Withdraw

The request pursuant to correspondence from the government to modify or withdraw the opinion in *In Re Grand Jury Subpoena Duces Tecum Dated May 9,*

---

**24.** *See also* Alito, *Documents and the Privilege Against Self–Incrimination,* 48 U.Pitt.L.Rev. 27, 54 n. 137 (there may be First Amendment limitations on subpoenas impinging on speech/religious interests, (citing, *inter alia, Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525 (1978); Friendly, *The Fifth Amendment Tomorrow: The Case for Constitutional Change,* 37 U.Cin.L.Rev. 671, 696 (1968); McNaughton, *The Privilege Against Self–Incrimination—Its Constitutional Affectation, Raison d'Etre and Miscellaneous Implications,* 51 J.Crim.L.Criminology & Pol.Sci. 138, 146 (1960)).

*1990* (M–11–189) (June 20, 1990) (the "Opinion") is denied for the reasons set forth below.

### Prior Proceedings

On June 20, 1990 this court issued the Opinion granting the defendant's motion to quash a grand jury subpoena *duces tecum* on the ground that the Fifth Amendment would preclude the production of certain personal records allegedly within the defendant's possession. The Opinion directed delivery of the documents in question to chambers for *in camera* review.

In mid-August, after the parties briefed and argued the question over which of the documents fell within the scope discussed in the Opinion, but prior to the application of the June 20 opinion to the specific documents in question, it was agreed between the parties that the defendant would enter a guilty plea which was taken on August 28, 1989. The government was given ten days to address the question of the status of the Opinion. All of the letters on this issue were considered fully submitted as of September 19, 1990.

### The Government's Request to Withdraw or Modify the Opinion is Denied

The government argues, and the court agrees, that at the time the Opinion was issued the court lacked a sufficient factual record to apply the legal principles set forth in the Opinion to the documents in this case. Indeed, the lack of the factual record prompted the direction for *in camera* review. The government and the court also agree that defendant's subsequent guilty plea mooted the motion to quash. According to the government the Opinion will be "misinterpreted and inappropriately cited in future cases" and therefore should be modified or withdrawn.

Upon review, this request is denied. The Opinion contains a discussion of the legal issues presented to the court at the time of the motion to quash and eschews any application of the law discussed to any particular documents involved in this case. Moreover, the Opinion held that the application of the law to the facts there presented required a review of the documents and that the court was awaiting the development of a complete factual record before applying the discussion to the documents involved. The Opinion is neither "preliminary" nor "incomplete." Whether the Opinion is subject to misinterpretation because the circumstances of this particular case precluded the court from applying the Opinion to the facts on this record is not within the further control of the court.

Accordingly, the government's informal request is denied.

It is so ordered.